RUFUS-ISAACS ACLAND & GRANTHAM LLP
ALEXANDER RUFUS-ISAACS, State Bar No. 135747
*aisaacs@rufuslaw.com*
9440 Santa Monica Blvd., Suite 301
Beverly Hills, California 90210
Telephone: (310) 770-1307
Facsimile: (424) 258-7383

Attorneys for Plaintiffs HORROR, INC., CRYSTAL LAKE ENTERTAINMENT, INC., and DIVERSION3 ENTERTAINMENT, LLC

RUFUS-ISAACS ACLAND & GRANTHAM LLP
9440 SANTA MONICA BLVD., SUITE 301
BEVERLY HILLS, CALIFORNIA 90210
Tel (310) 770-1307 • Fax (424) 258-7383

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

HORROR, INC., a Massachusetts corporation, CRYSTAL LAKE ENTERTAINMENT, INC., a Delaware corporation, and DIVERSION3 ENTERTAINMENT, LLC, a Nevada limited liability company,

Plaintiffs,

v.

GUN MEDIA HOLDINGS, INC., a Kentucky corporation, and DOES 1-10,

Defendants.

CASE No. 2:26-cv-9623

**COMPLAINT FOR DAMAGES FOR BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING; DEMAND FOR JURY TRIAL**

Plaintiffs Horror, Inc. ("Horror"), Crystal Lake Entertainment, Inc. ("Crystal Lake"), and Diversion3 Entertainment, LLC ("Diversion3") (collectively, "Plaintiffs") allege the following against Gun Media Holdings, Inc. ("Gun"), and Does 1-10:

## NATURE OF THE ACTION

1. This lawsuit seeks to hold Gun accountable for its failure to pay Plaintiffs millions of dollars in compensation from the publication and distribution of the video game entitled *Friday the 13th: The Game* ("Game"). Horror created the enormously successful *Friday The 13th* brand ("Brand") and, together with Crystal

RUFUS-ISAACS ACLAND & GRANTHAM LLP
9440 SANTA MONICA BLVD., SUITE 301
BEVERLY HILLS, CALIFORNIA 90210
Tel (310) 770-1307 • Fax (424) 258-7383

Lake's principal Sean Cunningham who directed and produced the ground-breaking first *Friday The 13th* film, nurtured the Brand over many years (together Horror and Crystal Lake are referred to herein as "Rights Holders"). Diversion3 helped the Rights Holders develop the concept for a new video game. The Brand comprises twelve films, two television shows, novels, comic books, video games, and tie-in merchandise. The films alone have grossed over $468 million at the box office and are considered one of the most successful media franchises in the USA—not only for the success of the films, but also because of the extensive merchandising and repeated references to the Brand in popular culture.

2. Pursuant to a Game Development Agreement dated as of September 3, 2015, as amended[1] ("Agreement"), Plaintiffs licensed elements of the Brand to Gun for the purpose of creating the Game and entrusted Gun with responsibility for distributing the Game worldwide. In return, Gun agreed to pay Plaintiffs five per cent (5%) and later seventeen and one-half percent (17.5%) of the Net Income from the Game as defined therein. Gun assumed responsibility for collecting the revenues from the third-party distributors ("Distributors") who sent periodic distribution reports for the Game to Gun ("Reports"). Gun used the Reports to prepare monthly royalty statements for Plaintiffs, accounting for all sales and expenditures in that period ("Statements") and agreed to pay Plaintiffs their share on a quarterly basis.

3. The Game generated over $175 million in gross revenues through the end of 2024. In 2024, Plaintiffs retained a prominent firm of forensic accountants to perform an audit. They found that while Gun acknowledged its contractual obligation to support an audit from inception, it had destroyed many of the Reports and supporting data that was crucial to proving the amount of royalties due the Plaintiffs. Therefore, in lieu of access to these third-party Reports, the auditor was

[1] The Agreement was amended in writing six times.

forced to reconstruct the revenues for the missing Reports through analytic procedures to determine the estimated amount of gross receipts received by Gun and reportable to the Plaintiffs. Based on the existing Reports and these analytic procedures, the accountants concluded that Gun had withheld approximately $4.0 to $4.5 million in royalties that it should have paid to Plaintiffs. Plaintiffs have tried to resolve their claims with Gun but without success. They now turn to this Court to obtain the compensation that Gun promised but has refused to pay.

**PARTIES, JURISDICTION AND VENUE**

4. Plaintiff Horror, Inc., is a Massachusetts corporation with its principal place of business in Boston, Massachusetts.

5. Plaintiff Crystal Lake Entertainment, Inc., is a Delaware corporation with its principal place of business in Encino, California.

6. Plaintiff Diversion3 Entertainment, LLC, is a Nevada limited liability company with its principal place of business in Las Vegas, Nevada.

7. Plaintiffs are informed and believe and thereon allege that defendant Gun Media Holdings, Inc., is a Kentucky corporation with its principal place of business in Lexington, Kentucky.

8. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) as the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. Additionally, the parties have expressly consented to the jurisdiction of this Court as stipulated in the Agreement which governs the dispute at hand.[2]

9. Venue is proper in this Court under 28 U.S.C. § 1391(b)(3) as the parties have agreed that any dispute arising out of or relating to said Agreement shall be resolved in this Court. Venue is proper in this District pursuant to 28 U.S.C.

---

[2] See ¶13(f) below.

RUFUS-ISAACS ACLAND & GRANTHAM LLP
9440 SANTA MONICA BLVD., SUITE 301
BEVERLY HILLS, CALIFORNIA 90210
Tel (310) 770-1307 • Fax (424) 258-7383

RUFUS-ISAACS ACLAND & GRANTHAM LLP
9440 SANTA MONICA BLVD., SUITE 301
BEVERLY HILLS, CALIFORNIA 90210
Tel (310) 770-1307 • Fax (424) 258-7383

Sections 1391(b) and 1400(a) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this district; or, in the alternative, pursuant to 28 U.S.C. Section 1391(b)(3), because there is no district in which this action may otherwise be brought, and Defendant is subject to the court's personal jurisdiction with respect to such action.

10. The defendants designated herein as "Does 1 through 10" ("Doe Defendant") are presently unknown to Plaintiffs. True names, identities, and capacities, and their respective relationship to the known defendants, are presently unknown to Plaintiffs, which therefore sue said Doe defendants by such fictitious names. The Doe defendants are believed to be individuals or entities that aided the named defendant in carrying out the unlawful activities described in detail below, either as independent contractors, or entered into a conspiracy and agreement with the known defendants to perform those acts, for financial gain and profit, in violation of Plaintiffs' protected rights. Plaintiffs request leave of Court to amend this Complaint to set forth their true names, identities, and capacities upon ascertaining the same. The Doe Defendants and the known defendant are sometimes referred to hereinafter collectively as "Defendants".

11. Plaintiffs are informed and believe and thereon allege that at all times material hereto each Defendant was the agent, representative and employee of each of the other Defendants and was at all times material hereto acting with the knowledge and consent of the other Defendants and within the course and scope of the agency, service, and employment, and that each Defendant named herein authorized and ratified the acts complained of herein.

## STATEMENT OF FACTS

### The Agreement

12. Horror owns or controls various rights to the Brand. In or about 2015, together with Crystal Lake and Diversion3, an entertainment and video games company, they began to explore the possibility of developing a new video game for

RUFUS-ISAACS ACLAND & GRANTHAM LLP
9440 SANTA MONICA BLVD., SUITE 301
BEVERLY HILLS, CALIFORNIA 90210
Tel (310) 770-1307 • Fax (424) 258-7383

the Brand. This led to discussions with Gun, which in turn led to the parties entering into the Agreement whereby the Rights Holders granted a limited license to Gun to create the Game.

13. The Agreement, as amended provides that

(a) Gun would control sales and marketing, subject to consultations with Plaintiffs;

(b) Gun would pay Plaintiffs inter alia five percent (5.0%) of the Net Income from the Game until Gun recouped certain development expenses and thereafter seventeen and one-half percent (17.5%) of the Net Income as defined therein;

(c) Gun would provide monthly accounting of all sales and expenditures for the Game and distribute any sums due of Plaintiffs quarterly;

(d) The Rights Holders retained the right to audit Gun for a period of the later of two (2) years after the final sale of the Game[3] or five (5) years after the execution of the Agreement;

(e) If an audit revealed an underpayment of at least 5% of amounts due to Rights Holders, Gun was obliged pay for the costs of the audit plus 10% interest on any underpayments; and

(f) It "shall be governed by the laws of the State of California applicable to agreements executed and to be wholly performed therein …. The parties agree that all unresolved disputes will be adjudicated within the circuit court system of California, in the county of Los Angeles. The prevailing party shall be awarded its attorneys' fees and costs..."

**<u>Subsequent Events</u>**

14. Sales of the Game commenced in 2017. For the first year, Gun

---

[3] Game sales continued beyond the date of the audit.

RUFUS-ISAACS ACLAND & GRANTHAM LLP
9440 SANTA MONICA BLVD., SUITE 301
BEVERLY HILLS, CALIFORNIA 90210
Tel (310) 770-1307 • Fax (424) 258-7383

provided Plaintiffs with detailed reporting derived directly from the Reports, including raw transaction reports it received from the Distributors. Thereafter it only provided Plaintiffs with summary statements showing what it claimed to have received and applying the contractual royalty percentage.

15. By letter dated June 13, 2024, Robinson Grannatt LLP ("RG"), a forensic accounting firm retained by Plaintiffs, notified Gun that Plaintiffs objected to Gun's statements and that they were electing to audit Gun's records.

16. By letter dated August 1, 2024, RG sent Gun a list of the records it needed in order to perform the audit. Gun's response was lackadaisical and half-hearted. By November, all it had produced were copies of some distribution agreements and some Microsoft statements. When asked when the rest would be provided, Gun's Chris Winfield, who was responsible for gathering the records, told RG, "It's very tedious and slow, and I have full-time responsibilities at Gun." In other words, you're a very low priority.

17. By April 2025, it had become clear that Gun was missing a large range of backup statements from the Distributors, especially Sony which appeared to be the largest Distributor of the Game. This surprised Plaintiffs because they knew that Sony's various international divisions would send purchase orders to the publisher which would generate an invoice that Sony then paid. This meant that Gun must have had the original purchase orders that Sony generated and/or their own invoices that they submitted to Sony for payment. Further, it made no sense to the auditors that Gun would lose or destroy these records knowing they had a contractual obligation to support an audit. Therefore, if Gun no longer had these records, it must have lost or destroyed them.

18. RP sent Gun's CEO Wes Keltner an email dated April 21, 2025, stating, "As for the "missing" Sony data. As an auditor I find it incredibly hard to believe that, in light of Gun's fiduciary duty and contractual obligation to support an audit, that no evidentiary documentation was maintained by Gun to support the

RUFUS-ISAACS ACLAND & GRANTHAM LLP
9440 SANTA MONICA BLVD., SUITE 301
BEVERLY HILLS, CALIFORNIA 90210
Tel (310) 770-1307 • Fax (424) 258-7383

statements rendered to my clients. In such cases, where the distributor possesses no support for the revenues reported, case law allows the auditor to analytically determine such revenues. As such, we will quantify our estimate of total revenues from Sony and hold Gun accountable, unless and until Gun is able to provide actual evidence to the contrary." Keltner's response was, "I'm expediting this as much as possible. We do have multiple projects in production and are doing our best." In other words, you're still a low priority.

19. As further evidence of Gun's uncooperative attitude, it was only in August 2025, in response to RG's probing questions, that Gun disclosed to Plaintiffs for the first time that it had used a Japanese company, Natsume Atari, for its physical and digital distribution of the Game in Japan. Gun entered into an agreement with Natsume for the Game in 2017, but it was only able to provide Plaintiffs with statements for FY2022 to FY2023.

**State of Gun's Accounting Records**

20. Gun appointed the Distributors to perform worldwide sales for the Game. In order to prepare accurate Statements to Plaintiffs, Gun relied on periodic Reports from the Distributors to compile and calculate royalties due. However, despite Gun having a contractual obligation to accurately report royalties due, and despite Plaintiffs having a contractual right to audit from the inception to date records of Gun, Gun remarkably did not save significant amounts of third-party distribution records they received over the years in support of the Statements they issued to Plaintiffs.

21. In addition, after the first year, Gun only reported 'current period' activity to Plaintiffs in each Statement and never prepared nor maintained an inception to date reconciliation of all third-party distribution activity to the ultimate amounts reported to Plaintiffs. Therefore, Gun had no internal controls to ensure that the Statements rendered to Plaintiffs were complete and accurate. RG found numerous cases where Gun appeared to simply omit third party activity from the

RUFUS-ISAACS ACLAND & GRANTHAM LLP
9440 SANTA MONICA BLVD., SUITE 301
BEVERLY HILLS, CALIFORNIA 90210
Tel (310) 770-1307 • Fax (424) 258-7383

Statements.

22. As a result of Gun's failure to provide complete records for all distribution activity, RG was forced to perform analytic procedures to determine unreported distribution activity primarily related to Sony, Nighthawk, and Natsume distribution, drawing from other reliable sources of distribution sales information, as well as investigative procedures and contacting Distributors directly, to analytically determine total amounts that Gun should have reported to Plaintiffs. Reconstructing gross receipts and royalties is acceptable in cases where the essential financial records are in the exclusive control of a distributor who would benefit from any incompleteness and yet failed to provide the supporting records.

**Additional Royalties Due**

23. In instances where available, RG relied upon third party distribution statements and reports of known activity to support its reconciliation. For instance, Gun did provide Xbox statement activity covering the period from inception through April 2024 for U.S. sales.

24. A key piece of supporting evidence for RG's compilation was the detailed compilation of gross receipts covering all Xbox, PS4, DLC and Steam sales prepared by Diversion3's CEO Steve Harris from inception of release of the Game through Q2 2018. The compilation was prepared by Mr. Harris directly from detailed reports of activity originally reported and provided by Gun. So, while Gun did not save the actual underlying records, this compilation served as a reliable base of support for all such activity from inception of the Game through Q2 2018.

25. RG also reviewed related third-party license agreements for each of the Distributors and accounted for any minimum guarantees paid to Gun for the initial license and also ensured that the gross receipts reported by Gun adhered to the Agreement as well as the terms of the Distributors' licenses.

26. Gun was unable to provide any support for the worldwide Sony sales beyond some of the PlayStation+ and PS Now sales activity for some years. RG

contacted Sony as an alternate to obtaining these inception-to-date sales records, however, Sony declined to provide those figures. RG had to perform analytic procedures to estimate Sony sales figures for the unsupported periods beyond Mr. Harris's Q2 2018 compilation.

27. On August 14, 2026, Gun provided Plaintiffs with documents which it described as additional accounting records from Sony. However, these documents turned out to be Excel files that could be edited, and an examination of the embedded data revealed that the statements beyond FY2022 were all modified on August 10, 2026. This constitutes a significant irregularity which makes these files unreliable.

28. RG relied on the consistent and known relationship between Xbox sales to Sony sales during the known period detailed in the Harris compilation and applied that same relationship for the unsupported period beyond the Q2 2018 compilation against the Xbox sales information which was supported by Distributors' Xbox reports. RG then increased the Sony sales by the known weighted average difference of 24.1% of U.S. PlayStation consoles compared to Xbox consoles for the period from January 2019 through 2024. Based on this analytic determination, RG estimated that Sony would have generated an additional $22.2 million of gross PlayStation sales beyond Q2 2018 compared to the reported and supported $18.0 million of gross Xbox sales earned subsequent to Q2 2018.

29. Despite numerous requests, Nighthawk was mysteriously unable to provide a statement for the missing reporting period from Q1 2021 through 2024. Therefore, RG implemented what it believed to be a conservative estimate of one third of Nighthawk sales for the known period from inception to Q4 2020.

30. There were some cases, such as the PS4 European sales subsequent to Q2 2018, where Gun was able to only provide an incomplete lineage of statements. In these cases, RG estimated the missing period revenue by analytically basing it on the known sales activity for the prior and subsequent months nearest to the

RUFUS-ISAACS ACLAND & GRANTHAM LLP
9440 SANTA MONICA BLVD., SUITE 301
BEVERLY HILLS, CALIFORNIA 90210
Tel (310) 770-1307 • Fax (424) 258-7383

RUFUS-ISAACS ACLAND & GRANTHAM LLP
9440 SANTA MONICA BLVD., SUITE 301
BEVERLY HILLS, CALIFORNIA 90210
Tel (310) 770-1307 • Fax (424) 258-7383

unsupported periods. Lastly, in support of the very significant Asian market, Gun was only able to provide the Natsume license agreement along with their statements for the limited period from January 2022 to December 2023. Therefore, RG were again forced to calculate an estimate for the Natsume sales.

31. The Natsume distribution agreement covered most of Asia, including Japan, China, Taiwan, Singapore, Indonesia, Malaysia, Thailand, India, Hong Kong, and Southeast Asia. Pursuant to Gun's own communication to Plaintiffs in early 2025, Gun had indicated that Asian sales accounted for at least 9.8% of total Game sales. Therefore, RG based its estimate on the 9.8% of all Game sales, which resulted in a total of $10.8 million in Natsume Game royalties paid to Gun from inception to April 30, 2024.

32. RG concluded that Gun had received an estimated $127 million of net royalty receipts from the Distributors, which is slightly less than Gun's representation to RG in a 2025 email that it had received $130 million. RG's calculation of total royalties due to Plaintiffs showed a difference of over $4 million between what has been paid and what is currently owed to them.

**<u>Interest Due on Additional Royalties and Reimbursement of Audit Fees</u>**

33. Pursuant to the Agreement, "If an audit reveals an underpayment of at least 5% of amounts due Rights Holders, the Developer (Gun) shall pay the cost of the audit plus 10% interest on any underpayments." $4 million represents an underpayment that is well in excess of 5% of the amounts due to Plaintiffs. Plaintiffs therefore seek their audit costs which are in excess of $38,000 and interest at 10% until full satisfaction of the unpaid additional royalties.

**<u>FIRST CAUSE OF ACTION FOR BREACH OF CONTRACT</u>**

**(Against All Defendants)**

34. Plaintiffs adopt, reallege, and by this reference incorporate, Paragraphs 1 through 33, inclusive, hereinabove.

35. The Agreement constitutes a valid and binding contract.

RUFUS-ISAACS ACLAND & GRANTHAM LLP
9440 SANTA MONICA BLVD., SUITE 301
BEVERLY HILLS, CALIFORNIA 90210
Tel (310) 770-1307 • Fax (424) 258-7383

36. Plaintiffs have performed all conditions, covenants, and promises required to be performed by them under the Agreement, except to the extent their performance was excused or waived.

37. Any and all conditions required for Gun's performance of the conditions, covenants, and promises required to be performed by it in accordance with the terms of the Agreement have occurred or been excused.

38. As detailed above and in RG's Audit Report, Gun has breached the Agreement by, among other things:

a. failing to accurately account for and report the revenues related to the production and exploitation of the Game,

b. failing to preserve the Distributors' Reports and related records, thereby artificially reducing the calculation of the participations it owed to Plaintiffs, while it unfairly and contrary to the purpose of the Agreement kept the discrepancy for itself and

c. failing to fairly and accurately pay for the participations it is obligated to pay Plaintiffs.

39. As a direct and proximate result of Defendants' breaches of the Agreement, Plaintiffs has suffered, and will continue to suffer, monetary damages in an amount to be proven at trial in excess of $4 million.

**<u>SECOND CAUSE OF ACTION FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING</u>**

**(Against All Defendants)**

40. Plaintiffs adopt, reallege, and by this reference incorporate, Paragraphs 1 through 39, inclusive, hereinabove.

41. The Agreement constitutes a valid and binding contract.

42. Plaintiffs have performed all conditions, covenants, and promises required to be performed by them under the Agreement, except to the extent their performance was excused or waived.

RUFUS-ISAACS ACLAND & GRANTHAM LLP
9440 SANTA MONICA BLVD., SUITE 301
BEVERLY HILLS, CALIFORNIA 90210
Tel (310) 770-1307 • Fax (424) 258-7383

43. Any and all conditions required for Gun's performance of the conditions, covenants, and promises required to be performed by Gun in accordance with the terms of the Agreement have occurred or been excused.

44. Gun unfairly, unreasonably, and in bad faith breached the covenant of good faith and fair dealing that is implied in every contract. Gun's breaches include its interference with Plaintiffs' right to receive the benefits of the Agreement by, among other things:

a. failing to include major sources of revenues in calculating the participations it owes Plaintiffs from the production and exploitation of the Game,

b. failing to preserve the Distributors' Reports and related records, thereby artificially reducing the calculation of the participations it owed to Plaintiffs, while it unfairly and contrary to the purpose of the Agreement kept the discrepancy for itself, and

c. failing to fairly and accurately account for and pay the participations it is obligated to pay Plaintiffs.

45. As a direct and proximate result of Defendants' breaches of the Agreement, Plaintiffs has suffered, and will continue to suffer, monetary damages in an amount to be proven at trial in excess of $4 million.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for Judgment against Defendants, and each of them, as follows:

A. For judgment in favor of Plaintiffs and against Defendants;

B. For damages in an amount to be proven at trial in excess of $4 million;

C. For a declaration of Plaintiffs' rights under the Agreements as alleged herein above;

D. For disgorgement;

E. For attorneys' fees and costs, to the extent provided by the Agreement and by law;

F. For pre- and post-judgment interest; and

G. For any other relief that the Court deems just and proper.

DATED: August 28, 2026

RUFUS-ISAACS ACLAND & GRANTHAM LLP

By: ______________________________
Alexander Rufus-Isaacs
Attorneys for Plaintiffs HORROR, INC., CRYSTAL LAKE ENTERAINMENT, INC., and DIVERSION3 ENTERTAINMENT, LLC

RUFUS-ISAACS ACLAND & GRANTHAM LLP
9440 SANTA MONICA BLVD., SUITE 301
BEVERLY HILLS, CALIFORNIA 90210
Tel (310) 770-1307 • Fax (424) 258-7383

RUFUS-ISAACS ACLAND & GRANTHAM LLP
9440 SANTA MONICA BLVD., SUITE 301
BEVERLY HILLS, CALIFORNIA 90210
Tel (310) 770-1307 • Fax (424) 258-7383

**DEMAND FOR JURY TRIAL**

Plaintiffs Horror, Inc., Crystal Lake Entertainment, Inc., and Diversion3 Entertainment, LLC, demand a trial by jury as to all issues so triable.

DATED: August 28, 2026

RUFUS-ISAACS ACLAND & GRANTHAM LLP

By: ______________________________
Alexander Rufus-Isaacs
Attorneys for Plaintiffs HORROR, INC., CRYSTAL LAKE ENTERTAINMENT, INC., and DIVERSION3 ENTERTAINMENT, LLC